[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
I. PROCEDURAL HISTORY
 A. Nature of the Action
On November 14, 1989, plaintiff Adelaide Kagan, a registered family home day care provider from West Hartford, Connecticut, brought this action against defendant Commissioner of Human Resources Elliot A. Ginsberg, in his official capacity as department head of the State Department of Human Resources ("DHR"), to obtain the following relief under General Statutes §§ 4-190 to4-197, the Connecticut Personal Data Act[1]: first, an order, under General Statutes § 4-195, that the defendant, disclose to her the entire contents of her state family day care home file, which DHR then maintained upon her as the "lead agency for child day care services in Connecticut[;]"[2]second, an award of damages, under General Statutes § 4-197, for certain losses she claims to have suffered due to the defendant's refusal to disclose the requested materials, allegedly in violation of General Statutes CT Page 5396 § 4-193 (g), since 1987; and third, an award of court costs and reasonable attorney's fees, also under Section 4-197, if she prevails on her above-described claim for damages. The case is now pending against State Commissioner of Public Health Stephen A. Harriman, who became the substitute defendant herein on July 1, 1995, when the General Assembly transferred statutory responsibility for the licensing and regulation of family day care homes to his agency, the State Department of Public Health ("DPH").[3]
 B. Pleadings
In her Revised Complaint dated July 20, 1990 ("R.C."), the plaintiff alleges that Commissioner Ginsberg refused to disclose the requested portions of her family day care home file to her on grounds that such disclosure would either invade the privacy of third parties or violate the mandate of General Statutes § 17-38a(g), later § 17a-101 (g), that "information contained in the reports and any other information relative to child abuse, wherever located, shall be confidential subject to such regulations governing their use and access as shall conform to the requirements of federal law and regulations." R.C., ¶¶ 6, 8 and 10. The plaintiff claims that by not disclosing the requested materials to her, the Commissioner has arbitrarily prevented her from exercising her rights under the Personal Data Act "to contest the accuracy, completeness or relevancy of h[er] personal data" in her family day care home file, to "correct[ such personal data] upon request . . . [if] the [Commissioner] concurs in the proposed correction," and/or, if she "believes that the [Commissioner] maintains inaccurate or incomplete personal data concerning h[er] to add a statement to the record setting forth what [s]he believes to be an accurate or complete version of [such] personal data." General Statutes § 4-193 (h). R.C., ¶ 11. She also claims that such non-disclosure has violated her state and federal constitutional rights to due process and equal protection of the law. R.C., ¶ 12.
In his Answer to the Revised Complaint, Commissioner Ginsberg admitted, inter alia, that he did indeed refuse to disclose the requested materials to the plaintiff on grounds that their disclosure would either invade the privacy of third parties or violate the confidentiality CT Page 5397 mandate of Section 17-38a(g). Answer to Revised Complaint ("Ans."), p. 1. He denied, however, that such refusal in any way violated the plaintiff's rights under the Personal Data Act itself or the Due Process or Equal Protection Clauses of the state or federal constitutions. Ans., p. 1.
The defendant also interposed the special defense ofres judicata. On that score he pleaded that:
 The right of the defendant to rely on the statutory non-disclosure pursuant to § 17-38a(g) of certain child abuse information contained in several inter-agency memorandum [sic] was expressly put at issue by the parties here, determined and adjudicated by a judgment by the Freedom of Information Commission In the Matter of a Complaint by Adelaide Kagan against the State of Connecticut Department of Human Resources (DOC #FIC 8-9 dated May 25, 1990 [sic]).
Ans., p. 2. In her Reply, the plaintiff denied this special defense.
C. Summary-Judgment Motions
After the pleadings were closed as aforesaid, the defendant moved for summary judgment on two grounds: first, that the plaintiff is barred from pursuing her pending claims under the doctrine of res judicata; and second, that in any event, the plaintiff cannot prevail on either such claim because the defendant's challenged refusal to release the requested materials was required by the Personal Data Act itself, and thus did not violate either that statute or any of the plaintiff's state or federal constitutional rights. The defendant has supported his motion with several legal memoranda and the following affidavits and materials: (1) a copy, under seal, of the non-disclosed portion of the plaintiff's family day care home file, together with an unsealed descriptive index of its contents; (2) a certified copy of the Final Decision of the Freedom of Information Commission in the plaintiff's earlier case before that agency requesting disclosure of CT Page 5398 one document from her family day care home file; (3) an affidavit from DHR employee Judith Walter, who avers that she handled the plaintiff's Freedom of Information Request and Personal Data Request on behalf of Commissioner Ginsberg; and (4) a certified transcript of Commissioner Ginsberg's deposition in this case.
The plaintiff responded to the defendant's motion by filing her own cross-motion for summary judgment. In her motion, the plaintiff claims that she is entitled to judgment as a matter of law on her claims that the Commissioner's refusal to disclose the requested information violated both the Personal Data Act and her state and federal constitutional rights to due process and equal protection of the law. She has supported both her own motion and her opposition to the defendant's motion with a personal affidavit, several attached exhibits, and several legal memoranda of her own.
D. Initial Proceedings on Motions
When these motions first came before the Court, the judge to whom they were assigned dismissed this action suasponte, ruling that the plaintiff lacked standing to prosecute it because she had failed to satisfy an essential jurisdictional requirement set forth in General Statutes § 4-194. On appeal, however, the Appellate Court reversed the trial court's order of dismissal and remanded the case for further proceedings on the parties' motion and cross-motion for summary judgment. Kagan v. Ginsberg,30 Conn. App. 794, 797 (1993).[4]
 E. Proceedings On Remand
After the case was remanded, the parties returned to this Court to argue their pending motions. At the conclusion of the hearing, however, they agreed that the Court should postpone its decision until they could discuss the possibility of settling the case. When the case did not settle, the parties so advised the Court and submitted the case for decision on the strength of their prior arguments.
In preparing its decision, the Court became aware that since the date of the challenged DHR decision not to CT Page 5399 disclose the requested personal data, new state regulations governing access to information pertaining to complaints of alleged child abuse in the files of the State family day care home program had been promulgated. One such new regulation, Reg. Conn. State Ag. § 19a-87b-14,[5]
specifically authorized the partial release of such information in the following terms:
(a) Anonymity of Complainant
 Any individual making a complaint against a day care applicant or provider may do so anonymously. If a complainant reveals his/her identity and requests confidentiality, the Department will not disclose the complainant's identity unless mandated by state or federal law.
 (b) Confidentiality of Child Abuse and/or Neglect Investigations
 For complaints that allege or that may constitute allegations of child abuse or neglect, detailed information, including but not limited to the identity of the complainant, shall be confidential. Information that can be disclosed include the number, types and dates of the Department's contact with the provider about the complaint issues, the general status of a current investigation about the complaint or the Department's findings if the investigation has been completed.
* * * *
Reasoning that part of its task in deciding the pending motions might be to determine if the requested materials are disclosable under current law, the Court met with counsel to propose that the substitute defendant, who had not yet had occasion to consider the disclosability of the requested materials under the new regulations, be given CT Page 5400 an immediate opportunity to do so. As a result of that meeting, the Court, with the consent of the parties, suspended all further proceedings in this case until the substitute defendant could answer the following question:
 If the Court's responsibility under General Statutes § 4-195 is to decide whether or not disclosure of requested personal data is "prohibited by law," and if the Court must base its decision on the law as it exists at the moment of that decision, not the law as it existed when the agency initially refused disclosure, is any of the personal data herein requested of a sort that is now exempt from disclosure under General Statutes § 17a-101 (g), formerly § 17-38 [a] (g), as currently implemented by relevant regulations of the Department of Public Health, including, particularly, Section 19a-87b-14?
Order of August 1, 1996, p. 2.
On September 12, 1996, the substitute defendant filed a legal memorandum answering the question raised in the foregoing Order. His position, as explained in that memorandum, can be summarized as follows: (1) the Court's decision on a petition for disclosure of personal data under Section 4-195 must be made under the law as it existed at the time of the defendant agency's challenged decision not to disclose; (2) in this case, Commissioner Ginsberg correctly decided not to disclose the requested personal data under the law as it was at the time of that decision; (3) even if Commissioner Ginsberg's decision not to release the requested materials was erroneous when made, the plaintiff is now barred from seeking review of that decision under the doctrine of res judicata; and (4) in any event, most of the materials here requested are still not subject to disclosure under the Personal Data Act because they remain confidential under General Statutes § 17a-101(g), as implemented by regulations of the DPH, including Section 19a-87b-14. In support of the latter argument, the substitute defendant filed an additional affidavit from DPH CT Page 5401 Program Supervisor Janet G. Chisholm, who supplied a comprehensive table listing and describing all of the requested documents which have thus far been withheld from the plaintiff, together with all of the reasons why disclosure of those documents is assertedly prohibited under prior and current law.[6]
In view of the substitute defendant's response to the Court's inquiry, the case is now before the Court for decision on the parties' pending motions.
II. SUMMARY JUDGMENT REQUIREMENTS
"Summary judgment `shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' Practice Book § 384. `In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the non-moving party. . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]'" Home Ins. Co. v. Aetna Life CasualtyCo., 235 Conn. 185, 202 (1995), quoting Water WayProperties v. Colt's Mfg. Co., 230 Conn. 660, 664-65
(1994). "[T]he parties are entitled to consideration, not only of the facts presented by their affidavits, but of the inferences which could be reasonably and logically drawn from them as well." (Internal quotation marks omitted).DeDomenicis v. American National Fire Ins. Co.,2 Conn. App. 686, 687 (1984).
In deciding a motion for summary judgment, the test to be applied is "whether a party would be entitled to a directed verdict on the same facts." Suarez v. DickmontPlastics Corp., 229 Conn. 99, 105-06 (1994). Thus summary CT Page 5402 judgment, like "`a directed verdict[,] may be rendered only where, on the evidence viewed in the light most favorable to the nonmovant, the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed.'" Miller v. United TechnologiesCorp., 233 Conn. 732, 751 (1995), quoting United Oil Co.v. Urban Redevelopment Commission, 158 Conn. 364, 380
(1969).
III. FACTUAL BACKGROUND
 A. Initial Child Abuse Investigation
In early 1987, the State Department of Children and Youth Services ("DCYS") contacted the State Department of Human Resources ("DHR") concerning allegations that one or more children may have been abused while in the care of the plaintiff at her family day care home. Because the plaintiff was then registered with DHR as a family home day care provider, DHR cooperated with DCYS in its investigation of these allegations, as required by General Statutes § 17-38f (now § 17a-106).[7]
In the course of that investigation, DHR received certain written reports from DCYS concerning the substance of the allegations in question. The first such report, a copy of a standard DCYS form entitled "Report of Suspected Child Abuse/Neglect," and known commonly as a CYS-136, was received on March 3, 1987.
On the basis of the initial CYS-136, DHR Day Care Program Specialist Joan Thistle-Fields joined an agent of DCYS, one Marissa Giarnella-Porco, in an unannounced visit to the plaintiff's family day care home in West Hartford on March 5, 1987. During that visit, Ms. Giarnella-Porco questioned the plaintiff concerning a child who had recently been in her care. The plaintiff, recalling the child, reported that she had once observed slight bruises on the child's buttocks, and stated that she had reported her observations to the child's mother at the time.
During the March 5 visit, the plaintiff asked Ms. Giarnella-Porco if any charges had been brought against her. She was told that no charges had been filed but that an investigation was ongoing and a report of the agency's CT Page 5403 findings would be prepared.
 B. Plaintiff's Informal Efforts to Learn Nature of Allegations Against Her and Obtain Results of Department's Investigation
The plaintiff later contacted Ms. Giarnella-Porco to obtain a copy of her report, but was informed that DCYS would not release it. Instead, she was advised that once DCYS's findings were transmitted to DHR, she could obtain the report through that agency.
On or about June 9, 1987, the plaintiff received a letter from Joan Thistle-Fields of DHR, reporting as follows on the results of the joint DCYS-DHR investigation:
 This letter is in reference to our investigation into the abuse allegation received by the Department of Human Resources on March 3, 1987.
 After much consideration and deliberation the Department of Human Resources has made the decision to not take any negative action against your family day care registration.
 In light of the seriousness of the complaint allegation and Department of Children and Youth Service [sic]
findings, I have been instructed by our Central Office to have staff monitor your family day care home with periodic unannounced visits.
Plaintiff's Ex. A-2.
After receiving this troubling letter, the plaintiff began what has now become a decade-long effort to obtain first part, then all, of her state family day care home file. Initially, the plaintiff made an oral request to Ms. Thistle-Fields for a copy of the original report of alleged child abuse which had led to the unannounced March 5, 1987 visit to her home. Next, she wrote a letter to Ms. CT Page 5404 Thistle-Fields, formally requesting: a written explanation of the basis for the statement in her June 9 letter that DHR had received an "abuse allegation" on March 3, 1987; a clarification of her statement in that letter that the "complaint allegations" and the "findings" of DCYS were "serious;" and copies of the "complaint allegation" and of DCYS's "findings." Plaintiff's Ex. A-3 (8/2/87 Letter from Kagan to Thistle-Fields).
On August 7, 1987, Ms. Thistle-Fields responded in writing to the plaintiff's requests, informing her that any information concerning the original abuse referral and the DCYS investigation thereof could only be obtained from DCYS. The letter also explained that any allegation that a child has been "injured in a Family Day Care Home is serious and merits attention by the Department of Human Resources." Plaintiff' Ex. A-4.
Dissatisfied with the foregoing response, the plaintiff wrote a follow-up letter to Ms. Thistle-Fields, demanding both a clarification of her "inaccurate and misleading" explanation concerning the alleged "seriousness" of the abuse allegations purportedly made against the plaintiff on March 3, 1987, and disclosure of the specific nature and contents of the communication between DCYS and DHR which had led to the unannounced home visit of March 5, 1987. Plaintiff's Exs. A-13 (11/16/87 Letter from Kagan to Thistle-Fields). Ultimately, on December 2, 1987, DHR Social Work Supervisor Carole Grayson responded to this letter with her own lengthy letter, in which she described as follows DHR's policies regarding the investigation and release of information concerning reports of child abuse in family day care homes:
 Whenever we receive a report that a child is injured by other than accidental means, DCYS is mandated to investigate the cause of the injuries. When we receive a report that a child who is injured is cared for in a Family Day Care Home, our department, as the registering agency, is mandated to do a joint home visit with DCYS and to co-investigate the matter. A copy of this policy is enclosed as per your CT Page 5405 request. The nature of the communication between the two departments is in both oral and written communication format. All information regarding the investigation of injuries suffered by a child is confidential by law. The specific communication between DHR and DCYS on this investigation, is therefore not to be released. It is, however, the responsibility of DCYS to inform you of their findings in this matter, so I am again referring you to that department for that information. To reiterate Mrs. Thistle-Fields' statement to you, any injuries sustained by a child, whether at home or in another setting such as school or day care, are considered to be "of a serious nature."
Plaintiff's Ex. 18,[8] p. 1.
 C. Plaintiff's Petition for Disclosure Under the Freedom of Information Act
Upon receiving Ms. Grayson's December 2 letter, the plaintiff made a formal written request of DHR under the State Freedom of Information Act. Specifically, she asked for the disclosure,
 [u]nder Connecticut General Statutes [§] 1-15 . . . [of] a copy of the inter-departmental communication between the Department of Child[ren] and Youth Services and the Department of Human Resources, received by D.H.R. on March 3, 1987, that preceded your unannounced visit to my home on March 5, 1987.
Plaintiff's Ex. A-20 (12/12/87 Freedom of Information Request).
On December 16, 1987, DHR formally denied the CT Page 5406 plaintiff's FOI Request in a letter from Carole Grayson. Ms. Grayson flatly stated that the requested information was not subject to public disclosure under General Statutes § 1-19 because "Connecticut General Statutes § 17-38a(g) mandates that any information relative to child abuse or reports of child abuse, wherever located, shall be confidential." Plaintiff's Ex. A-22 (DHR's 12/16/87 Denial of Plaintiff's FOI Request). This denial neither referenced nor purported to rely upon any departmental regulations implementing the confidentiality mandate of General Statutes § 17-38a(g) with respect to child abuse complaints or investigations, for no such regulations yet existed.[9] Id.
In view of DHR's denial of her FOI Request, the plaintiff wrote directly to the Freedom of Information Commission ("FOIC"), requesting review of that denial. Plaintiff's Ex. A-23 (1/4/88 Complaint to FOIC). Later, in a March 3, 1988 letter to FOIC Commissioner Curtis Cofield, she restated her request as follows:
 I am requesting a copy of the interdepartmental communication between [DCYS] and [DHR], received by D.H.R. on March 3, 1987 that led to an unannounced visit to my home on March 5, 1987.
Plaintiff's Ex. A-24. The plaintiff never requested the release of any other documents or materials before the FOIC.
On May 25, 1988, the FOIC met to consider the plaintiff's Complaint. As a result of its deliberations, the FOIC dismissed the Complaint, ruling that the requested inter-departmental memorandum was exempt from mandatory disclosure under the Freedom of Information Act because it constituted "information relative to child abuse," which had to remain confidential, wherever it was located, under General Statutes § 17-38a(g). Defendant's Ex. 1 (5/25/88 Final Decision of the FOIC). Like the denial of Commissioner Ginsberg which it affirmed, the FOIC's Final Decision did not cite or purport to rely upon any departmental regulation implementing the confidentiality mandate of Section 17-38a(g) with respect to child abuse CT Page 5407 complaints or investigations. The plaintiff took no appeal from the Final Decision of the FOIC.
 D. Plaintiff's Initial Request for Disclosure Under the Personal Data Act
Shortly thereafter, on November 3, 1988, the plaintiff made a new and different request of DHR. This time she wrote:
 By this letter I am requesting a copy of the entirety of my Family Day Care Home file to date, pursuant to the provisions of Chapter 55, Personal date [sic] Act, Sections [4-]190 through [4-]197 of the Connecticut General Statutes.
Citing the prior decision of the FOIC, the Commissioner denied this Request as well on the ground that information of the type requested must remain confidential, wherever it is located, under the mandate of General Statutes Sec. 17-38a(g). Here again, Commissioner Ginsberg did not purport to base his decision on any departmental regulation implementing the confidentiality mandate of Section 17-38a(g) with respect to child abuse complaints or investigations.
 E. Post-Investigation License Renewal Process and Resubmission of Personal Data Act Request
On June 23, 1989, the plaintiff began the day care registration renewal process. On the application was the following question: "HAVE YOU, OR ANY MEMBER OF THE HOUSEHOLD TO BE USED FOR DAY CARE, EVER BEEN INVESTIGATED FOR CHILD ABUSE OR NEGLECT? YES NO IF `YES,' PLEASE GIVE DETAILS." The plaintiff, who in the absence of the information she had been requesting from DHR refused to believe that any allegation of abuse had actually been made against her, marked "NO," and further commented, "I have no personal knowledge of any such investigation." DHR determined this response to be a false statement, and accordingly rejected the plaintiff's application. At the plaintiff's request, a fair hearing to comment on the CT Page 5408 denial of the plaintiff's application was scheduled for October 26, 1989.
Prior to the fair hearing, on September 29, 1989, the plaintiff, now acting through counsel, renewed her Request for disclosure of her entire family day care home file under the Personal Data Act. On October 16, 1989, the Department responded, over the signature of Commissioner Ginsberg, that the statutory exemption from disclosure in the Personal Data Act is identical to that of the Freedom of Information Act, and thus that the requested personal data would not be released because of the confidentiality requirements of General Statutes Section 17-38a(g). Here, as when he ruled on the plaintiff's earlier FOI and Personal Data Act Requests, the Commissioner based his decision solely upon the language of Section 17-38a(g), without citing or relying upon any departmental regulation implementing the confidentiality mandate of that statute with respect to child abuse complaints or investigations.
On October 26, 1989, when the plaintiff's fair hearing took place, the plaintiff argued that without further information from DHR, she could not answer the disputed question on her renewal application any better than she already had. Even so, DHR refused to release all or any part of the requested information, again citing Section 17-38a(g). Eventually, however, the hearing resulted in a compromise between the plaintiff and DHR. Under its terms: DHR agreed that it would formally represent to the plaintiff that she had indeed been investigated for alleged child abuse or neglect; the plaintiff agreed that solely on the basis of that representation, she would answer "YES" to question 18 on the renewal application; DHR agreed that by so answering the disputed question, the plaintiff would not be deemed to have admitted either that the allegation of abuse or neglect under investigation was valid or had any substance, or that she had committed, been involved in, or participated in the alleged abuse or neglect; and both parties agreed that the plaintiff's answer would only be construed to mean that DHR had informed her that an investigation of abuse or neglect had taken place. Upon resubmitting her application in accordance with this compromise, the plaintiff's family home day care registration was finally renewed. CT Page 5409
F. Filing of this Action
On November 14, 1989, within thirty days of the Commissioner's denial of her Personal Data Request, the plaintiff commenced the instant action.
IV. DEFENSE OF RES JUDICATA
 A. Governing Principles
"Collateral estoppel is that aspect of res judicata which is concerned with the effect of a final judgment on the subsequent litigation of a different cause of action involving some of the issues determined in a former action between the parties." Corey v. Avco-Lycoming Division,163 Conn. 309, 317 (1972). "`Where a question of fact essential to the judgment is actually litigated and determined by a valid and final judgment, the determination is conclusive between the parties in a subsequent action on a different cause of action. . . . (2) A judgment on one cause of action is not conclusive in a subsequent action on a different cause of action as to questions of fact not actually litigated and determined in the first action. Restatement, Judgments § 68.'" Id., quoting Brockett v.Jensen, 154 Conn. 328, 337 (1966). "[A] decision of an administrative board, acting in a duly authorized judicial capacity, is a prior decision within the rule of res judicata." Corey v. Avco-Lycoming Division, supra, 318.
To prevail on a claim of collateral estoppel, a claimant must initially demonstrate that some factual issue which is essential to the determination of his pending case was actually litigated and determined against his opponent in a prior action or proceeding between them. Absent such a showing of congruence between an issue actually litigated and determined in the prior case and an essential issue in controversy in the pending case, the defense of collateral estoppel is unavailable as a matter of law.
B. The Defendant's Claim
The defendant's initial claim on his motion for summary judgment is that the plaintiff is barred from pursuing her claims for relief under the Personal Data Act by the doctrine of res judicata. In particular, he argues CT Page 5410 that the plaintiff is collaterally estopped from relitigating the central issue here presented for decision — whether disclosure of the plaintiff's family day care home file is legally prohibited — because that very issue was fully and fairly litigated and decided against her in the May 25, 1988 Final Decision of the State Freedom of Information Commission on her FOI appeal.
In this case, claims the defendant, one issue that must be decided is whether DHR properly denied the plaintiff's second Personal Data Act Request when that Request was initially presented for its decision. This, he claims, is so because both aspects of the plaintiff's Personal Data Act claim — her petition for disclosure of personal data under General Statutes § 4-195 and her claim for damages, costs and attorney's fees under General Statutes § 4-197 — assertedly depend upon proof that Commissioner Ginsberg's refusal to disclose was unlawful when made.
Here, notes the defendant, the Commissioner based his refusal to disclose the requested personal data on the combined operation of two statutes: General Statutes §4-194, which provides that an agency to which a request for disclosure of personal data is made "shall refuse disclosure where required by law[;]" and General Statutes § 17-38a(g), which then provided that "any information relative to child abuse, wherever located, shall remain confidential subject to such regulations governing their use and access as shall conform to the requirements of federal law and regulations." Applying these statutes to the contents of the plaintiff's family day care home file, the Commissioner concluded that the materials in the file were exempt from disclosure under Section 4-194 because they contained information relative to child abuse, whose confidentiality was statutorily mandated by Section 17-38 (g). Here, then, claims the defendant, the issue presented for decision is whether the Commissioner correctly decided that disclosure of the requested materials was prohibited by Section 17-38a(g).
The defendant contends that this very issue was decided adversely to the plaintiff in the Final Decision of the State Freedom of Information Commission on the plaintiff's earlier FOI appeal. There, notes the CT Page 5411 defendant, the issue presented for decision was whether one document from the plaintiff's family day care home file — the inter-departmental memorandum from DCYS to DHR which led to the unannounced, March 5, 1987 visit to her home — was exempt from disclosure under the State Freedom of Information Act, General Statutes § 1-15 et seq., due to the operation of General Statutes § 17-38a(g). The FOIC, affirming the decision of Commissioner Ginsberg, concluded that the document in question constituted information relative to child abuse, and thus that its disclosure was absolutely prohibited under Section 17-38a(g).
The defendant urges this Court to rule that the aforementioned finding of the FOIC applies with equal force to all "information relative to child abuse, wherever [it may be] located," and thus that it applies to all portions of the plaintiff's family day care home file which contain similar information. On that basis, the defendant argues that the plaintiff is collaterally estopped from "relitigating" this issue at this time.
 C. Application of Collateral Estoppel Principles to Claims Under the Personal Data Act
 1. Differences in Substantive Scope Between the Plaintiff's FOI Complaint and Her Instant Petition for Disclosure Under General Statutes Section 4-195
Defeats the Defendant's Claim That the FOIC's Dismissal of the Former Collaterally Estops Her From Litigating the Latter
There are two fundamental reasons why the defendant's collateral estoppel claim must be rejected. Initially, and most simply, the scope of the FOIC's decision on the plaintiff's FOI Complaint was limited to the single document as to which disclosure was sought under the Freedom of Information Act, the inter-departmental memorandum whose transmission from DCYS to DHR led to the unannounced, March 5, 1987 visit to the plaintiff's home. The other portions of the plaintiff's family day care home file, some of which were not even in the file by the time CT Page 5412 her FOI Complaint was dismissed, were simply not the subject of the plaintiff's FOI appeal. Therefore, since the alleged producibility of those documents under the State Freedom of Information Act, despite the confidentiality mandate of General Statutes § 17-38a(g), was not actually litigated or finally determined in the May 25, 1988 Final Decision of the FOIC, the plaintiff cannot be collaterally estopped by that Final Decision from litigating the producibility of those documents under the Personal Data Act.
 2. Since this Court's Decision on the Plaintiff's Pending Disclosure Petition Under Section 4-195 Must Be Made Under Current Law, and Current Law Governing Access to Child Abuse Information Is Different From That on Which the FOIC Based Its Decision to Dismiss Her Earlier FOI Appeal, the Plaintiff Cannot Be Collaterally Estopped by the FOIC's Decision From Successfully Prosecuting Her Pending Section 4-195 Claim
Secondly, the underlying premise of the defendant's collateral estoppel claim — that both of the plaintiff's pending claims under the Personal Data Act depend upon proof that Commissioner Ginsberg's threshold refusal to disclose was unlawful when made — is incorrect. Instead, for the following reasons, the Court concludes that at least as to the plaintiff's petition for disclosure of personal data under General Statutes § 4-195, the issue before the Court is not whether the Commissioner's original refusal to disclose was unlawful, but whether the petitioner is presently entitled to disclosure of the requested documents and materials under current law. Since new state regulations governing use of and access to child abuse information have been promulgated since the time of the Commissioner's refusal to disclose and the FOIC's Final Decision of the plaintiff's FOI appeal, that Final Decision, which was made under prior law, did not decide the same issue which must now be decided by this Court. Absent an identity of issues between the earlier FOIC Final Decision and this case, the plaintiff cannot be collaterally estopped from fully litigating her pending claims. CT Page 5413
That the true focus of the trial court's inquiry in deciding a petition for disclosure of personal data under General Statutes § 4-195 is the petitioner's present entitlement to disclosure under current law, not the propriety of the agency's original refusal to disclose under then-existing law, is well supported both by the language and structure of the Personal Data Act itself and by controlling case law thereunder. Since its enactment in 1976, the Personal Data Act has imposed strict requirements upon most agencies of state and local government which collect, maintain, use and/or disseminate "personal data," which the Act now defines as
 any information about a person's education, finances, medical or emotional condition or history, employment or business history, family or personal relationships, reputation or character which because of name, identifying number, mark or description can be readily associated with a particular person. "Personal data" shall not be construed to make available to a person any record described in subdivision (3) of subsection (b) of section 1-19.
General Statutes § 4-190 (9). The Act thus requires each agency which maintains a "personal data system" — that is, any "collection of records containing personal data," General Statutes § 4-190 (10) — to "adopt regulations . . . which describe: (1) The general nature and purposes of its personal data systems; (2) The categories of personal or other data kept in [its] personal data systems; (3) The agency's procedures regarding the maintenance of personal data; and (4) The uses to be made of the personal data maintained by the agency." General Statutes § 4-196. It also requires each such agency to assume the following duties with respect to the data in its personal data systems and all persons whose interests may be affected by the misuse of such data:
 (a) Inform each of its employees who operates or maintains a personal CT Page 5414 data system or who has access to personal data, of the provisions of (1) this chapter, (2) the agency's regulations adopted pursuant to section 4-196, (3) chapter 3 and (4) any other state or federal statute or regulation concerning maintenance or disclosure of personal data kept by the agency;
 (b) Take reasonable precautions to protect personal data from the dangers of fire, theft, flood, natural disaster or other physical threats;
 (c) Keep a complete record, concerning each person, of every individual, agency or organization who has obtained access to or to whom disclosure has been made of personal data and the reason for each such disclosure or access; and maintain such record for not less than five years from the date of obtaining such access or disclosure or maintain such record for the life of the record, whichever is longer;
 (d) Make available to a person, upon written request, the record kept under subsection (c) of this section;
 (e) Maintain only that information about a person which is relevant and necessary to accomplish the lawful purposes of the agency;
 (f) Inform an individual in writing, upon written request, whether the agency maintains personal data concerning him;
 (g) Except as otherwise provided in section 4-194, disclose to a person, upon written request, on aCT Page 5415 form understandable to such person, all personal data concerning him which is maintained by the agency. If disclosure of personal data is made under this subsection, the agency shall not disclose any personal data concerning persons other than the requesting person;
(h) Establish procedures which:
 (1) Allow a person to contest the accuracy, completeness or relevancy of his personal data;
 (2) Allow personal data to be corrected upon request of a person when the agency concurs in the proposed correction;
 (3) Allow a person who believes that the agency maintains inaccurate or incomplete personal data concerning him to add a statement to the record setting forth what he believes to be an accurate or complete version of that personal data. Such a statement shall become a permanent part of the agency's personal data system, and shall be disclosed to any individual, agency or organization to which the disputed personal data is disclosed.
General Statutes § 4-193 (Emphasis added.)
In particular reference to an agency's duty to disclose personal data upon written request, the Act sets forth the following exceptions in General Statutes § 4-194:
 (a) If an agency determines that disclosure to a person of medical, psychiatric or psychological data concerning him would be detrimental to that person, or that nondisclosure CT Page 5416 to a person of personal data concerning him is otherwise permitted or required by law, the agency may refuse to disclose that personal data, and shall refuse disclosure where required by law. In either case, the agency shall advise that person of his right to seek judicial relief.
A requesting party's "right to seek judicial relief," to which reference is made in Section 4-194 (a), is set forth as follows in General Statutes § 4-195:
 If disclosure of personal data is refused by an agency under section 4-194, any person aggrieved thereby may, within thirty days of such refusal, petition the superior court for the judicial district in which he resides for an order requiring the agency to disclose the personal data. Such a proceeding shall be privileged with respect to assignment for trial. The court, after hearing and an in camera review of the personal data in question, shall issue the order requested unless it determines that such disclosure would be detrimental to the person or is otherwise prohibited by law.
The plaintiff's initial request for relief in this case has been brought under Section 4-195.
In addition to the foregoing right, whose obvious purpose is to afford any person requesting access to his personal data a speedy judicial determination as to the disclosability of that personal data, the Act grants a broader right of action to any person who is aggrieved by any agency's violation of any of the Act's provisions. The latter right is set forth as follows in General Statutes §4-197:
 Any agency which violates any provision of this chapter shall be CT Page 5417 subject to an action by any aggrieved person for injunction, declaratory judgment, mandamus or a civil action for damages. . . . Any aggrieved person who prevails in an action under this section shall be entitled to recover court costs and reasonable attorney's fees.
The plaintiff's second and third requests for relief in this case have been brought under Section 4-197.
In Steadwell v. Warden, 186 Conn. 153, 156-57 (1982), the Connecticut Supreme Court authoritatively decided that the role of the trial court in ruling on a petition for disclosure of personal data under Section 4-195 is not, as in an administrative appeal, to review the legality of the agency's challenged decision, but to conduct an independent review of the requested data and make a de novo
determination as to its disclosability under the Act. After quoting at length from the statute itself, the Steadwell Court thus observed that
 The petition filed under this section seeks an independent determination by the court of whether disclosure is required. The hearing provided is the aggrieved party's first opportunity to contest the issue by presenting evidence. The agency decision does not result in a record which the trial court may review. . . . Therefore, the present case is not an administrative appeal subject to the procedural restrictions for further review imposed by General Statutes [Sec.] 51-197b.
Id.
Under this ruling, the trial court's task, in the language of the statute, is to answer two questions: First, "would [disclosure of the requested personal data] be detrimental to the person [requesting it]?" And second, "is [such disclosure] otherwise prohibited by law?" If the answers to both questions are in the negative, the statute CT Page 5418 commands that the petitioner's request for disclosure be granted.
By their very nature, these two inquiries focus on the moment of the court's decision and thereafter, not on some unspecified moment in the past when the agency made its decision not to disclose. Thus if the court, in deciding whether or not disclosure of requested personal data would be detrimental to the person requesting it, learns of facts supporting nondisclosure of which the agency was never apprised, it would not be required to release the data merely because the agency, in understandable ignorance of those facts, would have been justified in so doing. The protective purpose of this statutory exception would be ill-served by imposing such an artificial, time-bound restriction upon the court's de novo factfinding function. Similarly, if the court became aware of new facts supporting disclosure which were unavailable to the agency when it made its decision, it could obviously rely upon those facts in reaching a different result. Clearly, the true question presented by this inquiry is whether the petitioner's presumptive right to disclosure is outweighed by other, potentially more important considerations, such as whether he would suffer harm if disclosure were ordered. The court's decision how to balance those competing considerations must be based on the best available data at the time the balance is made, not on outmoded data that might once have appeared to support a different conclusion.
The second part of the court's inquiry, no less than the first, necessarily focuses on the petitioner's present
right of access to the information he has requested, not on any prior right he may have had when the agency first made its decision. The statutory question, to restate it, is whether or not the requested disclosure "is otherwise prohibited by law." General Statutes § 4-195 (emphasis added). As a matter of common usage, the present-tense phrasing of this simple statutory inquiry strongly suggests that the proper answer to that inquiry depends on the present, not the past, state of the law.
Such a conclusion, moreover, is entirely consistent with the de novo nature of the court's decisionmaking function. At bottom, the question whether disclosure "is otherwise prohibited by law" is a mixed question of law and CT Page 5419 fact. That is, it involves the application of particular legal principles to particular historical facts. Logically, if the court's answer to that question, underSteadwell, can lawfully be based upon the application of the same set of legal rules which the agency relied on to a different set of material facts, which the agency did not have before it when it refused disclosure, that answer can similarly be based upon the application of new anddifferent legal principles, either to the same or to some different set of facts. In every case, the court's determination and the agency's determination will be as to different mixed questions of law and fact, with the court's determination always based upon a fuller set of facts and a more up-to-date understanding of controlling law than that of the defendant agency. Ordering the immediate disclosure of that which a petitioner has a present right to know and the defendant agency has a present obligation to disclose to him obviously advances the overriding purpose of the Personal Data Act, which is to ensure that all citizens, upon request, have prompt and proper access to all non-exempt personal data concerning them in the files of state and local governmental agencies.
Finally, though the Court has found no case that directly rules on this issue, it has found a strong indication in the Steadwell decision that our Supreme Court will adopt the foregoing analysis. There, the ultimate issue presented for decision was whether a presentence investigation report ("PSI"), prepared in advance of a criminal sentencing, was subject to disclosure under the Personal Data Act. The plaintiff, then an inmate confined at the Connecticut Correctional Institution, Somers, claimed that it was, but the defendant Warden disagreed.
In resolving this issue, the Supreme Court first found that the Department of Correction ("DOC") was an "agency" to which the Personal Data Act applied. Then, upon describing the typical contents of a presentence investigation report, including "the circumstances of the offense, the attitude of the victim or his immediate family, the criminal record, social history and present condition of the defendant, and, if desirable, the mental and physical state of the defendant," Steadwell, supra, 158-59, the Court concluded that a PSI was "personal data," which must be disclosed unless it fell within a statutory CT Page 5420 exemption. Id., 157-59. Ultimately, the Court decided that even though the Connecticut Practice Book exempted PSIs from disclosure, they were disclosable under the Personal Data Act because the Superior Court was not constitutionally empowered to abrogate substantive statutory rights which did not encroach upon the operation or structure of the courts. Id., 162.
In determining that a PSI constituted potentially disclosable "personal data," within the meaning of the Personal Data Act, the Court made the following, very interesting observation:
 Prior to October 1, 1978, the definition of "personal data" included criminal history. Section 2 of Public Acts 1978, No. 78-200, entitled "An Act Concerning Security and Privacy of Criminal History Record Information as Required by Federal Regulations," deleted "criminal history" from General Statutes § 4-190 (i). Section 1 of that act, however, expressly excluded PSI information from the definition of "criminal history." General Statutes § 54-142g(a). Accordingly, the amendment of General Statutes § 4-190 (i) between the time of the plaintiff's request for disclosure and the judgment rendered by the trial court on November 7, 1978 is of no consequence in the present case.
Steadwell, supra, 158 n. 9. Though this passage does not formally hold that the law to be applied by a trial court in ruling on a petition under Section 4-195 is that which exists at the time of its own decision, its potential significance on that issue is enormous. What it plainly suggests is that if the substantive law affecting the disclosability of PSIs had materially changed between the time of the agency's decision and that of the trial court's decision on the disclosure petition, the new law would have governed the trial court's decision even though it had not previously been considered by the defendant agency. CT Page 5421 Surely, if the intervening amendment could not possibly have affected the trial court's decision as to the scope of the petitioner's rights in the case before it, because it was required to base that decision on the law as it was when the agency denied disclosure, the Supreme Court would never have mentioned the amendment, much less analyzed its relationship to prior law, in announcing its own ruling.
In sum, this Court concludes that in ruling on a disclosure petition under Section 4-195, the trial court's decision whether or not disclosure "is . . . prohibited by law" must necessarily be based upon current law, even if that law is different than the law on which the defendant agency relied when it made its challenged decision not to disclose.
From 1987, when the plaintiff first requested disclosure of the March 3, 1987 inter-departmental memorandum from DCYS to DHR under the Freedom of Information Act, until October 16, 1989, when Commissioner Ginsberg denied the plaintiff's final request for disclosure under the Personal Data Act, General Statutes § 17-38a(g), later recodified at § 17a-101 (g), provided in relevant part that:
 . . . information contained in the reports and any other information relative to child abuse, wherever located, shall be confidential subject to such regulations governing their use and access as shall conform to the requirements of federal law and regulations.
Since then, however, new state regulations governing use of and access to child abuse information have been promulgated, and more recently, Section 17a-101 (g) itself has been repealed.[10] The new regulations, which remain in effect to this day, clearly control the extent to which the plaintiff is presently entitled to disclosure of child abuse information in her state family day care home file. Because no prior determination as to the disclosability of the documents here requested, including the May 25, 1988 Final Decision of the FOIC on the plaintiff's FOI appeal, was based on or took account of this regulation, no such CT Page 5422 prior determination can collaterally estop the plaintiff from litigating that issue at this time.
 4. Effect of the FOIC's Final Decision on the Plaintiff's Claims Under Section 4-197
As for the plaintiff's claim for damages, costs and attorney's fees under General Statutes § 4-197, however, the Court must agree with the defendant that any action for damages due to the alleged violation of any of the Personal Data Act's provisions must necessarily be based on the claim that the challenged actions of the defendant agency were unlawful at the time they were engaged in. Where, in particular, the claimed illegality involves the allegedly wrongful refusal to disclose requested personal data, the legality of the agency's actions must be tested as of the moment of its refusal to disclose. If it were otherwise, financial penalties could be imposed retroactively on those whose conduct was wholly lawful when they engaged in it, which would be both unfair and nonsensical. Here, then, though no claim of collateral estoppel can be relied upon to bar the plaintiff from pursuing his damages claim, since the FOIC's decision only addressed the disclosability of one requested document under the Freedom of Information Act, the substance of the plaintiff's claim must be decided under the law which governed the disclosability of child abuse information at the time of the Commissioner's original refusal to disclose, not the current law governing disclosure, under which the plaintiff's Section 4-195 claim must be decided.
 V. VIABILITY OF THE PLAINTIFF'S CLAIMS FOR DAMAGES AND OTHER RELIEF UNDER SECTION 4-197
On October 16, 1989, when DHR Commissioner Ginsberg formally denied the plaintiff's second request for disclosure under the Personal Data Act, his department had no regulations whatsoever implementing the confidentiality mandate of General Statutes § 17-38a(g) with respect to child abuse complaints and investigations. Thus, when the Commissioner read the text of Section 17-38a(g) together with that of General Statutes § 4-194, which declares that any agency to which a Personal Data Act Request is directed CT Page 5423 "shall refuse disclosure where required by law," his statutory responsibility was to refuse disclosure of everything in his agency's files that Section 17-38a(g), unlimited by implementing regulations, had declared to be "confidential, wherever located." This, of course, included anything that could fairly be characterized as "information contained in the reports and any other information relative to child abuse[.]"
The documents and materials now sought by the plaintiff, all of which were requested in her September 29, 1989 Personal Data Act Request, are all related by a common theme: each either consists of, describes or was written to document, summarize or evaluate the results of the State's investigation of a report of alleged child abuse at the plaintiff's family day care home on February 17, 1987. Thus, though all of the requested materials do not contain detailed descriptions of alleged child abuse, or set forth information from which alleged victims of possible child abuse can be identified, each, by its very nature and purpose for existence, is either a "report . . . relative to child abuse" or a document containing "other information relative to child abuse," within the meaning of Section 17-38a(g).
Under the law as it was on October 16, 1989, Commissioner Ginsberg clearly did not violate the Personal Data Act by refusing to disclose the requested documents under the authority of General Statutes § 17-38a(g). Therefore, since the plaintiff's claim for damages and other relief due to the Commissioner's alleged violation of the Act is based exclusively on that refusal to disclose, the defendant is entitled to judgment on that claim as a matter of law.
 VI. VIABILITY OF THE PLAINTIFF'S PETITION FOR DISCLOSURE UNDER SECTION 4-195
Having concluded that its task in deciding the plaintiff's Section 4-195 petition for disclosure is to determine which of the requested documents or parts thereof are disclosable under current law, the Court has carefully analyzed the contents of each such document under the criteria set forth in Reg. Conn. State Ag. § 19a-87b-14.[11]
CT Page 5424 On the basis of that analysis, it has separated the documents into four basic categories.
The first category of documents which the Court has identified are those which are wholly exempt from disclosure under the Personal Data Act because their release is prohibited by Reg. Conn. State Ag. § 19a-87b-14
(b). Documents in this category consist entirely of "detailed information" about "complaints that allege or that may constitute allegations of child abuse[.]" Reg. Conn. State Ag. § 19a-87b-14 (b). Some such documents describe alleged conduct by the plaintiff that either constitutes or may be claimed to constitute an act or acts of child abuse. Others disclose personal, professional or other information that tends to identity one or more alleged victims of child abuse, the parent or guardian of such an alleged victim, or any other person who makes a child abuse complaint against a day care applicant or provider but "requests confidentiality" under Reg. Conn. State Ag. § 19a-87b-14 (a).
The second category of documents which the Court has identified are those which, though they are partially exempt from disclosure under the Personal Data Act because they contain at least some "detailed information" of the sort that cannot be disclosed under Section 19a-87b-14 (b), may properly be released in redacted form once their confidential contents have been removed. The Court has specifically identified all portions of each such document which must be redacted therefrom in order to make the remainder of the document producible under the Personal Data Act.
The third category of documents which the Court has identified are those which are partially exempt from disclosure under the Personal Data Act because they contain personal data about persons other than the plaintiff. On this score, General Statutes § 4-193 (g) provides as follows: "If disclosure of personal data is made under this subsection, the agency shall not disclose any personal data concerning persons other than the requesting person." The obvious purpose of this rule is to ensure that the privacy interests of third persons are protected even as the petitioner's legitimate interest in gaining his own personal data is being satisfied. To implement the rule CT Page 5425 in this case, the Court has specifically identified those portions of each document in this category which must be redacted in order to make the remainder of the document producible under the Personal Data Act.
The fourth and final category includes those documents which can properly be disclosed in their entirety under the Personal Data Act because they contain no "detailed information" concerning alleged child abuse, within the meaning of Section 19a-87b-14 (b), and no "personal data concerning persons other than the [plaintiff,]" within the meaning of General Statutes § 4-193 (g).
Because the documents in question are currently under seal, the Court must so articulate its ruling as to give both parties a clear understanding of its factual basis and legal rationale without compromising the defendant's right to keep the requested documents confidential until the judgment of this Court becomes final. What follows is the Court's best effort to strike that delicate balance, with all documents referred to by the numbers assigned to them in the table of claimed exemptions from disclosure which accompanied the September 11, 1996 affidavit of DPH employee Janet G. Chisholm.[12]
Document #1 is correctly described in Ms. Chisholm's table as "DHR notes on [a] phone call received from [a] parent who was concerned about bruises that her child allegedly received on February 17, 1987 while in Mrs. Kagan's care." It is fully exempt from production under the Personal Data Act because it consists entirely of "detailed information" about a complaint of alleged child abuse, which is not producible under Section 19a-87b-14 (b). A one-page handwritten document, it briefly but explicitly describes the particular conduct which is the subject matter of the complaint and identifies the complainant by name, phone number and name of family physician.
Document #2A, which is correctly described in Ms. Chisholm's table as "DHR notes on [a] phone call received from DCYS on [a] report of child abuse which allegedly occurred on February 17, 1987 to a day care child in Mrs. Kagan's care[,]" is partially exempt from disclosure under the Personal Data Act because it contains certain "detailed information" about a complaint of alleged child abuse, CT Page 5426 within the meaning of Section 19a-87b-14 (b). In particular, it includes one 7-line handwritten entry which must be redacted from the document before it is released because it explicitly describes the alleged conduct which is the subject matter of a child abuse complaint. Apart from that entry, the balance of this one-page document must be disclosed because it contains neither detailed information concerning acts or allegations of child abuse nor personal data concerning third parties.
Document #3A is a two-page handwritten document which Ms. Chisholm describes only as "[n]otes on child abuse investigation, originating from 2-17-87 complaint." On its first page, it includes one 8-line entry which briefly but explicitly recounts the specific allegations of possible child abuse that precipitated the investigation in question and names the person who reported those allegations. On its second page, it names two third parties whose involvement in the underlying incident or the investigation thereof cannot be ascertained. Both entries must be redacted from the document before it is released, the former under Reg. Conn. State Ag. § 19a-87b-14 (b), and the latter under General Statutes § 4-193 (g). The balance of the document is disclosable because it merely describes the department's general approach to the investigation through March 16, 1987 and summarizes the plaintiff's stated views to about certain aspects of her approach to child rearing.
Document #4 is a three-page document which Ms. Chisholm erroneously describes as a "Memo from Carole Grayson to Joan Thistle-Fields, both of DHR, describing joint visit of child abuse [sic] on March 5, 1987." In fact, the document is a memorandum from Ms. Thistle-Fieldsto Ms. Grayson which more broadly describes both the genesis of the joint DCYS-DHR investigation of Mrs. Kagan's family day care home and the course of that investigation from February 18, 1987, the date of the original complaint, through March 13, 1987, when an attorney for Mrs. Kagan telephoned DHR to inquire about the department's reasons for scheduling another home visit. This document is partially exempt from disclosure under the Personal Data Act because it contains certain "detailed information" about a complaint of alleged child abuse, within the meaning of Section 19a-87b-14 (b). In particular, it includes the following entries, all of which must be CT Page 5427 redacted before the balance of the document can be released: on the first page, in the sections marked "victim" and "parent," information explicitly identifying a possible victim of child abuse and the parent of that child; also on the first page, in the section marked "February 18, 1987," a detailed description of the allegations of possible child abuse which reportedly prompted the joint DCYS-DHR investigation of Mrs. Kagan's family day care home; and on the second page, at the end of the third full paragraph in the section marked "March 5, 1987," a detailed description of Mrs. Kagan's possible mistreatment of two named children, as allegedly observed by the joint investigating team during their visit to her home on that date. The balance of this document must be released, however, for it contains only the following, non-confidential information: a general chronology of the investigation, listing and describing contacts with Mrs. Kagan and her lawyer concerning scheduling matters; and, in the remainder of the section marked "March 5, 1987," a description of the investigating team's observations, discussions with Mrs. Kagan and conclusions on that date which did not involve, describe or relate to the underlying allegations of possible child abuse that prompted their investigation. The latter entry deals exclusively with Mrs. Kagan's hostile reaction to the investigators on March 5, 1987 and her perceived unwillingness to cooperate with them at that time.
Document #6 is correctly described in Ms. Chisholm's table as "Investigation notes referencing sequence of events that allegedly occurred after child was allegedly abused on February 17, 1987." This two-page handwritten document is fully exempt from production under the Personal Data Act because it consists entirely of "detailed information" about a complaint of alleged child abuse, which is not producible under Section 19a-87b-14 (b). In particular, it identifies the complainant, describes the possible victim's observed injuries, recounts the plaintiff's explanation for those injuries and the child's doctor's rejection of that explanation, and describes the plaintiff's alleged mistreatment of other day care children in the complainant's presence.
Document #8 is a two-page DCYS form dated March 2, 1987 which is partially exempt from disclosure under the CT Page 5428 Personal Data Act because it contains certain "detailed information" concerning allegations of possible child abuse within the meaning of Section 19a-87b-14 (b). In particular, it lists both the name of the complainant and the name and other identifying information about a possible victim of child abuse, all of which must be redacted from the document before it can be released. The rest of the document, however, is producible despite the objections of the substitute defendant, because: despite Ms. Chisholm's representation to the contrary, it contains no "narrative on abuse allegations;" though it lists the name and institutional affiliation of the Town of West Hartford official who "referred" the complaint to DCYS, that information is not confidential because the "referrer" specifically indicated, in the body of the form itself, that she did not "wish to remain anonymous;" and the remainder of the document contains only personal information about the plaintiff herself.
Document #9 is a one-page handwritten narrative which specifically describes abuse allegations against the plaintiff and names both the person who reported those allegations and the child to whom they relate. It is fully exempt from production under the Personal Data Act because it consists entirely of "detailed information" about a complaint of alleged child abuse, within the meaning of Section 19a-87b-14 (b).
Document #10B is correctly identified by Ms. Chisholm as a CYS-136, a "DCYS form entitled `Report of Suspected Child Abuse/Neglect' referencing investigation of [the] investigation of [the February 17, 1987] incident" of alleged child abuse at the plaintiff's family day care home. Apart from certain limited entries therein which contain basic identifying information about the plaintiff, it is exempt from disclosure under the Personal Data Act because it identifies the complainant, identifies and describes the child to whom the complaint relates, and provides detailed information about conduct claimed to constitute child abuse and evidence claimed to support that claim.
Document #11A is correctly described by Ms. Chisholm as a "Cover letter for HUM-1130 and third party information." Except for that portion of its second full CT Page 5429 sentence which identifies a third party whose letter supplying evidence of possible child abuse is attached thereto, this document is producible under the Personal Data Act. The sentence fragment which identifies the author of the attached letter must be redacted from the document because disclosure of the letter writer's identity would almost certainly reveal the identities of both the complainant and the child to whom the complaint allegations relate, in violation of Section 19a-87b-14 (b).
Document #11C is an 11-page document entitled DCYS Intake Closing Narrative. It is partially exempt from disclosure under the Personal Data Act because it contains both "detailed information" concerning a complaint that alleges or that may constitute allegations of child abuse, within the meaning of Section 19a-87b-14 (b), and personal data concerning third parties, which is not disclosable under General Statutes Sec. 4-193 (g). Information which must be redacted from Document #11C under Section 19a-87b-14
(b), because it describes acts of possible child abuse by the plaintiff and/or identifies the possible victims of such abuse or persons complaining thereof, can be found in the following portions of the document: on the first page, all materials in the sections marked "Child Referred" and "Mother," plus all highlighted material in the first three paragraphs in the section marked "Referral;" on the second page, all highlighted material in the fourth paragraph; on the third page, all highlighted material in the first line and the first three full paragraphs on the page; on the fourth page, the entire first paragraph, plus all names of persons reporting and reported victims of possible child abuse which are listed in the first sentence of the fifth paragraph; on the fifth page, everything in paragraphs 3, 6, and 8-13; on the sixth page, everything; on the seventh page, everything except paragraph 8; on the eighth page, everything in paragraphs 1-4; on the tenth page, paragraph 10 only; and on the eleventh page, the highlighted portions of the first full paragraph in the section marked "Assessment." Portions of the document which must be redacted because they contain personal data about third parties other than the plaintiff include: on the third page, the names, addresses and phone numbers of other children in the plaintiff's family day care home and their parents; on the eighth page, everything in paragraphs 5-9, on the ninth page, everything in paragraphs 1-10, and on CT Page 5430 the tenth page, everything in paragraphs 1-4, 8 and 9, all of which describe detailed conversations with the parents of other children in the plaintiff's family day care home concerning their children's experiences with and reactions to the plaintiff's care and supervision. The remainder of the document contains information which is producible under the Personal Data Act because it generally describes the progress of and steps taken during the investigation of the plaintiff's family day care home without providing any information concerning the substance of the initial abuse allegations or identifying any complainant or reported victim of possible child abuse. The only detailed information not redacted from the document relates to the plaintiff's hostile response to the joint investigative team and her perceived unwillingness to cooperate in their investigation, which is contained in the following portions of the document: on the first page, the last line; on the second page, paragraphs 1-3; on the third page, the fourth full paragraph; on the fourth page, paragraphs 2-4.
Document #11D is the letter from a third party to which reference was made in Document #11A. It must not be released to the plaintiff because it consists entirely of "detailed information" concerning an abuse allegation, which is not producible under Section 19a-87b-14 (b).
Document #12B is described by Ms. Chisholm as a DCYS CYS379 Case Establishment Form. Though this one-page document is claimed to contain "detailed information," within the meaning of Section 19a-87b-14 (b), in fact it does not. The only person identified on this form other than the plaintiff is an official "referrer" from the Town of West Hartford whose identity need not remain confidential because she specifically stated, on the form itself, that she did not "wish to remain anonymous." The form, which is dated July 27, 1987, contains absolutely no description of the factual basis for the referral. Its disclosure, unedited, is therefore required under the Personal Data Act.
Document #12C, by contrast, is fully exempt from disclosure under the Personal Data Act because it consists entirely of "detailed information" concerning allegations of possible child abuse in the plaintiff's family day care home. More specifically, the document purports to describe CT Page 5431 the plaintiff's interactions with certain children in her day care home, as personally observed by the writer during a licensing visit to the plaintiff's home in late July of 1987.
Document #13B is described by Ms. Chisholm as a one-page "Third party letter alleging abuse." This description, however, is incorrect for several reasons. First, the writer of this letter is no mere third party complainant whose identity must remain confidential, but the very same referrer from the Town of West Hartford who, in Document #12B, specifically disclaimed any desire to remain anonymous when she made her referral. The letter, moreover, is not a complaint about possible child abuse, but a proposal to DHR that the plaintiff's day care license not be renewed because, in the opinion of the writer, the plaintiff lacked sufficient emotional stability to meet the licensing requirements. Accordingly, though the letter makes general reference to the writer's own observations of the plaintiff's treatment of the children in her care, it contains no "detailed information" either describing the nature of the plaintiff's observed conduct or identifying the supposed victims of that conduct. This document is producible in its entirety under the Personal Data Act.
Document #13C is described by Ms. Chisholm as a "Third party report on visit to day care home." In fact, it is a report of a relicensing visit to the plaintiff's family day care home by the very same Town of West Hartford official who later wrote Document #13B and submitted it to DHR, proposing that the plaintiff's day care registration not be renewed. The first full paragraph on the first page of the letter, in the section marked "Observations," is exempt from disclosure under the Personal Data Act because it contains "detailed information" about the plaintiff's alleged interactions with her day care children, as reportedly observed by the writer and claimed by the writer to constitute acts or evidence of possible child abuse. The balance of the report, however, must be produced, for it deals exclusively with the plaintiff's hostile reaction to being questioned about her day care methods and operations, and not at all with allegations of possible child abuse, by the writer or anyone else.
Document #14 is a one-page set of typed notes CT Page 5432 detailing the response of DHR to the receipt of Documents ##12B, 12C, 13A, 13B and 13C from the Town of West Hartford. Though this document discusses the concerns of the referrer from West Hartford that the plaintiff should not be relicensed, it contains no "detailed information" concerning allegations of possible child abuse, within the meaning of Section 19a-87b-14 (b). Therefore, it is fully disclosable under the Personal Data Act.
Document #15 is described by Ms. Chisholm as follows: "Narrative of home visit made by DHR in response to 7-27-87 complaint. Discusses provider's response to child abuse allegations and contains many references to third party complainant." This description, however, is inaccurate, since the "third party complainant" to whom reference is made is the very same Town of West Hartford official who specifically disclaimed any desire to remain anonymous when making her referral. When, to reiterate, a complainant does not seek to remain anonymous, there is no basis for withholding his or her identity from a person seeking personal data under Section 19a-87b-14 (a). Therefore, the disclosure of a document naming such a complainant does not violate the requirement of General Statutes § 4-193 (g) that no disclosure under the Personal Data Act reveal the personal data of third parties. The Court thus concludes that the only portions of Document #15 that must be redacted before the balance is disclosed to the plaintiff are as follows: on the first page, all of paragraph 9 and the first full sentence of paragraph 10. These brief entries are the only entries on the entire document which discuss the provider's response to specific child abuse allegations. The balance of the document describes only the plaintiff's dissatisfaction with the Town of West Hartford's licensing visit to her home and with her own inability to learn the true reasons for and results of the original DCYS-DHR investigation.
Document #16 is described by Ms. Chisholm as a four-page set of "DHR notes on conducting a home visit to investigate 7-27-87 allegation and notes of third party's visit." With the exception of a brief passage at the end of paragraph 6 on page 3, which must be redacted because it contains "detailed information" about specific allegations of possible child abuse by the plaintiff, this document is fully disclosable under the Personal Data Act. The balance CT Page 5433 of the document does not describe alleged child abuse, identify persons complaining about or reportedly suffering from such abuse, or reveal personal data about third parties who have in any way sought to preserve their anonymity with respect to information provided about the plaintiff.
Document #17A, which has been described by Ms. Chisholm a "Memo dated 8/24 from Carole to Jeanne discussing problems with third party concerns," is subject to the same analysis as Document #15. Though the substitute defendant argues that it is exempt from disclosure under the Personal Data Act because such disclosure would constitute an invasion of personal privacy of [a] third party," that claim is without merit since the only third party complainant it references is one who explicitly disclaimed any desire to remain anonymous in Document #12B. For reasons previously stated, there is therefore no basis for keeping secret her identity under Section 19a-87b-14 (a), or for refusing to disclose her name to the plaintiff under General Statutes § 4-193 (g).
Document #17B is claimed by the substitute defendant to contain detailed information of the kind that cannot be produced under Section 19a-87b-14 (b). However, it does not. This two-page handwritten document, a memorandum from Joan Thistle-Fields to Carole Grayson expressing concerns about the Town of West Hartford's persistent pursuit of its own investigation of the plaintiff and the potentially negative consequences thereof, contains not a word of detailed information about alleged child abuse, and reveals absolutely no personal data about third parties. Because any claim to the contrary is completely unfounded, the document must be produced in its entirety for the plaintiff's inspection.
Document 17C is a letter from the Town of West Hartford to Joan Thistle-Fields of DHR summarizing the Town's concerns about the ability of the plaintiff to provide a healthy, nurturing environment for small children. The substitute defendant correctly claims that this memorandum makes specific reference to the allegations of possible child abuse on February 17, 1987 which sparked the original investigation of the plaintiff's family day care home. He incorrectly suggests, however, that the CT Page 5434 entire document should be withheld from the plaintiff for that reason. In fact, the only reference to the original child abuse allegations concerning events on February 17, 1987 appears in two short sentences near the end of the first paragraph on the first page of the memorandum. The Court agrees with the substitute defendant that these two sentences must be redacted. It concludes, however, that the balance of the memorandum must be disclosed since it contains only general information, observations and conclusions about the plaintiff's emotional stability and competence as a day care provider, not detailed information — indeed, not any information — about alleged child abuse.
Finally,[13] Document #20 is correctly identified by Ms. Chisholm as a "Memo from Carole Grayson, DHR to Assistant Attorney General Sharon Scully regarding Mrs. Kagan's request for an administrative hearing." In 1989, this document was claimed to be exempt from production under the Personal Data Act because it pertained to strategy on a pending claim in litigation. Today, claims the substitute defendant, the legal basis for non-production remains the same even though the administrative hearing on the non-renewal of the plaintiff's day care registration is long since completed. On review of the document in question, the Court concludes that the substitute defendant is correct. That is, it must agree that the document is not producible under the Personal Data Act because it is a direct communication from an institutional client, the State Department of Human Resources, with its statutorily designated legal counsel, the State Attorney General, for the purpose of procuring legal advice and assistance. As such, it is fully protected by the attorney-client privilege, and thus may not be disclosed for any purpose.
CONCLUSION
For all of the foregoing reasons, the Court concludes that while the substitute defendant is entitled to the entry of summary judgment in his favor on the plaintiff's claim for damages, costs and attorney's fees under General Statutes § 4-197, he must now disclose substantial portions of the plaintiff's State family day care to her under General Statutes § 4-195, as that statute must currently be construed and applied in light of applicable State CT Page 5435 regulations governing access to child abuse information in the relevant files of the State Department of Public Health.
SHELDON, J.